UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RHONDA FLEMING,

          Plaintiff,

      v.

UNITED STATES OF AMERICA, et al.,

          Defendants.

Case No.  22-cv-05082-RFL


**ORDER GRANTING USA'S MOTION TO DISMISS AND DENYING WARDEN JUSINO'S MOTION TO DISMISS**

Re: Dkt. Nos. 162, 163


Plaintiff Rhonda Fleming brings suit against Defendants United States of America, William Lothrop (in his official capacity as Acting Director of the Federal Bureau of Prisons ("BOP")), and Thahesha Jusino, former warden of Federal Correctional Institution, Dublin ("FCI Dublin").  In her operative complaint, Fleming alleges that while she was incarcerated at FCI Dublin, she was subjected to toxic environmental conditions and denied access to necessary medical treatment for her worsening health.  (Dkt. No. 133-2 ("TAC").)  Fleming asserts claims under the Federal Tort Claims Act ("FTCA") for negligence and intentional infliction of emotional distress and an Eighth Amendment claim for injunctive relief against the United States and Lothrop, and an Eighth Amendment *Bivens* claim for damages against Jusino.  (TAC ¶¶ 71–116.)  Defendants move to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 162 (Jusino); Dkt. No. 163 (United States and Lothrop).)  For the reasons that follow, the United States and Lothrop's motion is **GRANTED**, and those claims are dismissed without prejudice to being refiled after presenting them to the Bureau of Prisons for its evaluation.  Jusino's motion is **DENIED**.

1

## I.    BACKGROUND

The facts detailed below are based on the allegations contained in the operative complaint, the truth of which the Court accepts for purposes of resolving the motions to dismiss. *See Boquist v. Courtney*, 32 F.4th 764, 772 (9th Cir. 2022).

### A.    Conditions at FCI Dublin

FCI Dublin was a federal low-security women's prison in Dublin, California.  (TAC ¶ 11.)  Although poor living conditions are alleged to have been "serious, systemic problems . . . at FCI Dublin . . . for decades," whistleblowers and media reports revealing the egregiousness of the living conditions have caused the prison to come under "intense public scrutiny" in recent years.  (*Id*. at ¶¶ 14–15.)  Prisoners at FCI Dublin were exposed to mold, asbestos, and walkways covered in wild geese excrement, all of which can cause severe negative health effects including mesothelioma, upper respiratory tract symptoms, and histoplasmosis.  (*Id*. at ¶¶ 16–17.)

After officials of the prison workers' union filed whistleblower complaints in 2022, the U.S. Office of Special Counsel determined that FCI Dublin had violated Occupational Safety and Health Administration standards by exposing prison staff and inmates to asbestos.  (*Id*. at ¶ 18.) Despite all this, however, FCI Dublin "failed to remediate the toxic environmental conditions at the prison."  (*Id*.)  Indeed, in March 2024, a Special Master was appointed to supervise FCI Dublin following a finding by another judge in this District that BOP had "proceeded sluggishly" in ameliorating the environmental conditions in FCI Dublin.  (*Cal. Coalition for Women Prisoners v. United States*, No 23-cv-04155-YGR, Dkt. No. 222 at 1.)[1]

On April 15, 2024, BOP officials announced that they would close FCI Dublin.  (TAC ¶ 21.)  Individuals then incarcerated at FCI Dublin were transferred to "various other federal prisons throughout the country."  (*Id*.)

### B.    Fleming's Incarceration at FCI Dublin

Fleming had originally been transferred from FCI Tallahassee to FCI Dublin on June 22, 2022, allegedly in retaliation for her asking for a prison grievance form.  (*Id*. at ¶¶ 23, 45.)  Upon

---

[1] All references to page numbers in documents on the docket refer to ECF pagination.

2

her arrival at FCI Dublin, "her health began to rapidly deteriorate due to the prison's hazardous environmental conditions," which she was exposed to "every day of [her] incarceration at FCI Dublin." (*Id.* at ¶¶ 24–25.)

*Bird Feces*. Fleming was "without an escape from [bird] feces wherever she went." (*Id.* at ¶ 25.) Walkways outside of the prison contained piles of bird feces, and Fleming was forced to walk through those walkways to eat meals at the Food Services building. (*Id.*) Feces from outside would ultimately get tracked into the building and throughout FCI Dublin's Housing Unit. (*Id.*)

*Mold*. "FCI Dublin's dilapidated infrastructure" caused flooding and perpetual dampness within the prison, which resulted in "the growth of visible, black mold." (*Id.* at ¶ 26.) Fleming saw black mold in FCI Dublin's showers and on its ceiling tiles, floor tiles, and walls. (*Id.*) Mold was also present in one of Fleming's cells in FCI Dublin. (*Id.* at ¶ 27.) The cell had a hole under the sink that was approximately five to six inches wide, exposing Fleming and her cellmate to "visible yellow wall insulation, torn drywall, rotting wood, and visible mold in the area where the water pipes connected to the sink." (*Id.*) Fleming alleges that her cellmate "experienced issues clearing her throat, a runny nose, and mild headaches" since moving into the cell, and that her cellmate "believed it to be related to the hole in the wall." (*Id.*)

*Asbestos*. FCI Dublin also had asbestos throughout its facilities. (*Id.* at ¶ 28.) Fleming saw friable asbestos in her cell, in floor and ceiling tiles throughout the prison, and in the pipe insulation. (*Id.*) Fleming alleges that FCI Dublin staff had "the floor tiles buffed" despite there being asbestos in the tiles, which released asbestos in the air. (*Id.*)

*Contaminated Water*. On occasion, pipes would break in FCI Dublin, and sewage would mix with the prison's drinking and bathing water. (*Id.* at ¶ 29.) When this occurred, Fleming was forced to drink and shower in contaminated water. (*Id.*) She would experience symptoms "such as an upset stomach, diarrhea, headaches, and skin rashes." (*Id.*) Fleming alleges that this occurred approximately ten times during her incarceration at FCI Dublin. (*Id.*)

3

*Lack of Heating*.  A visit to FCI Dublin by another judge in the District revealed that the prison lacked adequate heating.  (*Id*. at ¶ 30.)  Accordingly, the court ordered FCI Dublin to provide each inmate with two blankets due to the lack of heat in certain parts of the prison.  (*Id.*)  Fleming alleges that her cell was "in the 40-degree Fahrenheit range" and that conditions were "significantly worse" in the Special Housing Unit ("SHU").  (*Id.*)

According to Fleming, FCI Dublin staff failed to remediate the "toxic environmental conditions at the prison," and her daily exposure to these conditions, in turn, negatively impacted her health.  (*Id*. at ¶¶ 18, 31.)  Though Fleming acknowledges that she had "experienced some breathing difficulties" during her prior incarceration at FCI Tallahassee, "these difficulties quickly escalated following her arrival at FCI Dublin."  (*Id*. at ¶ 31.)  During her incarceration at FCI Dublin, Fleming experienced such symptoms as chronic sinusitis, coughing spasms, headaches, shortness of breath, extreme fatigue, eye irritation, memory problems, and stomach and muscle pain.  (*Id*.)  She was diagnosed with asthma and eventually put on medication designed to treat chronic obstructive pulmonary disease.  (*Id*. at ¶ 32.)  At one point, "she required a wheelchair because she could no longer walk."  (*Id*. at ¶ 30.)

Despite being transferred out of FCI Dublin on April 19, 2024 (*id*. at ¶ 23), Fleming continues to experience her symptoms (*id*. at ¶ 33).  She is often unable to "sleep for more than a few hours at a time" due to nighttime coughing fits.  (*Id*.)  Despite previously being an avid runner who ran five to six miles, six days a week, Fleming is now unable to run, has gained "significant weight," and is experiencing hair loss.  (*Id*.)  Fleming alleges that her symptoms "have significantly diminished her self-esteem and quality of life" and that she lives in "fear that her long-term exposure to environmental toxins will lead to even more severe conditions" in the future.  (*Id*. at ¶ 34.)

### C.   Fleming's Complaints and Requests for Medical Care, and Alleged Retaliation

During her nearly two-year incarceration at FCI Dublin, Fleming made "repeated and consistent attempts to seek healthcare for these environmentally-caused conditions."  (*Id*. at ¶ 35;

*see also id.* at ¶ 8.)  However, her attempts were ignored or denied.  Fleming alleges that despite her complaints, she was not treated by specialists, did not receive a comprehensive health exam, and was not removed from the conditions causing her "respiratory distress."  (*Id*. at ¶ 38.) Fleming briefly saw a pulmonologist during her incarceration, but the pulmonologist informed her that he could not provide her treatment until further testing was completed.  (*Id*. at ¶ 39.) Fleming was told that she would only be allowed to go to such testing if she was shackled.  (*Id*.) However, Fleming refused to consent to shackles because her custody status allegedly did not require her to be shackled when leaving the prison, and as a result, she was "denied access to the appointment."  (*Id*.)  Fleming also allegedly had inconsistent access to medications she needed for her health conditions.  She states that there were "multiple instances where her prescriptions were not refilled."  (*Id*. at ¶ 68.)  Furthermore, prison staff would make comments to Fleming that suggested that BOP did not want to pay for certain medications she needed, such as eye drops.  (*Id*.)

On July 11, 2022, Fleming mailed a "Standard Form 95" to BOP.  (*Id*. at ¶ 50.)  In her Form 95, Fleming claimed damages for personal injuries she suffered including "headaches, body pain, runny nose, fatigue, and breathing problems" as a result of her exposure to "friable asbestos, toxic mold, and bird feces" throughout FCI Dublin.  (Dkt. No. 133-2 at 37 ("Ex. 6").) Fleming alleges that six months after she submitted the form, BOP had failed to decide her claim.  (TAC ¶ 50.)  According to BOP, it never received Fleming's Form 95.  (Dkt. No. 163 at 6.)

Fleming also made several attempts to file grievances through FCI Dublin's grievance system to compel BOP to provide her with her desired medical care.  (TAC ¶ 41.)  However, she alleges that she was "denied access to the required forms" and that prison staff "consistently" refused to provide her with blank forms and accept her completed forms.  (*Id*.)  In June and July 2022, she asked her Unit Manager several times for grievance forms, both verbally and by email. (*Id*. at ¶ 43.)  However, her Unit Manager never provided her with the forms she requested.  (*Id*.)

5

On July 5, 2022, Fleming emailed then-Warden Jusino "regarding her inability to access the grievance process." (*Id*.)

In August 2022, Fleming repeatedly emailed Jusino to discuss her worsening health. On August 5, Fleming emailed Jusino that she was "coughing all night . . . and unable to sleep more than an hour at a time because [she was] coughing and choking." (*Id*. at ¶ 35.) The email also requested a transfer to home confinement, informing Jusino that Fleming "saw Dr. Tang last week" and that he "acknowledged [her] sensitivity to the mold and asbestos at [FCI Dublin] . . . but he stated that there was nothing he could do about this ailment." (Dkt. No. 133-2 at 27 ("Ex. 1").) Fleming emailed Jusino again on August 9, 2022, saying that she "need[ed] treatment aimed at preventing further exposure to mold/asbestos/excessive bird droppings, contaminates that are causing [her] disease." (Dkt. No. 133-2 at 29 ("Ex. 2").) In an email on August 15, 2022, Fleming told Jusino that she was "coughing more and more" every day and her breathing was "getting worse." (*Id*.)

On August 19, 2022, Fleming reiterated her request for grievance forms, stating that she had been unable to obtain the necessary forms during her time at FCI Dublin. (TAC ¶¶ 44, 46.) Though Fleming acknowledged that the Unit Manager had called her and offered her one of the necessary forms, the BP-9 form, she was not offered the three other forms that she needed to complete her grievance (the informal grievance form, the BP-10 form, and the BP-11 form). (*Id*. at ¶ 46.) She also informed Jusino, "I do not want to be alone with any BOP employee to ask them for grievance forms because I was assaulted by a BOP employee the last time I requested grievances." (*Id*. at ¶ 44.) According to Fleming, when she requested a grievance form while incarcerated at FCI Tallahassee, a case manager hit her in the chest and falsely accused her of being the aggressor. (*Id*.) Fleming was allegedly punished for this interaction: "she was placed in segregation, lost good time credits, and was subjected to a disciplinary transfer to FCI Dublin." (*Id*.)

On September 3, 2022, Fleming emailed Jusino asking that she be removed from the "toxic environment" at FCI Dublin, specifically mentioning the "mold, asbestos, and bird

dander/feces." (*Id.* at ¶ 37.) Fleming informed Jusino, "I have been crying, literally, shedding tears out of fear for my life, not to get cancer, for medical relief." (Dkt. No. 113-2 at 31 ("Ex. 3").) She also informed Jusino that Dr. Rutledge confirmed that she had a "serious respiratory illness." (*Id.*) Jusino allegedly did not respond for a month. (TAC ¶ 37)

Fleming emailed Jusino again on September 14, 2022, reiterating her concerns about her continued exposure to asbestos and mold, as well as her challenges in accessing the prison's grievance process. (*Id.* at ¶ 47.) Regarding her health, Fleming wrote, "Until last week, the prison was still buffing the floors, forcing me to inhale friable asbestos. My cough is not a 'new' medical problem. I have told you about it in person and in many of these electronic requests. The BOP's own physician has stated I have lung disease." (Dkt. No. 133-2 at 37 ("Ex. 5").) She emphasized, "You are aware that I have lung disease. You know your prison has mold/asbestos/bird contamination, which aggravates the disease I have. I am a disabled inmate and this facility is not suitable." (*Id.*) She again stated, "I have a serious medical condition that has become worse while in your care and have repeatedly asked you to remove me from the contaminates here at FCI-Dublin." (*Id.*) As to the grievance process, Fleming reported that she had asked her Unit Manager for an informal grievance form, and her Unit Manager had laughed at her. (*Id.*) Fleming's email asserted that her Unit Manager "knew that submitting a BP-9, without first submitting an [informal grievance form], the BP-9 would be rejected." (*Id.*) She admitted that she "gave up on obtaining the correct form" because it was "physically dangerous for an inmate to keep asking for grievances." (*Id.*)

Fleming alleges that she was retaliated against for her "attempt[s] to bring awareness to misconduct at FCI Dublin." (TAC ¶ 55.) In September 2022, Fleming met with the FBI and the US Attorney's Office regarding their investigation into allegations of sexual abuse at the prison. (*Id.*) She claims that after the meeting, her request to transfer out of FCI Dublin was denied; she was denied food, telephone access, and access to her mail; she had her custody classification unexpectedly changed; BOP staff called her a "snitch"; and she was temporarily transferred to Metropolitan Detention Center Los Angeles. (*Id.* at ¶ 56)

7

Fleming also allegedly faced further reprisal for her attempts to report BOP misconduct outside of her participation in the FBI investigation. (*Id*. at ¶ 57.) In January 2024, various BOP employees warned Fleming that she should "expect retaliation from the Acting Warden Art Dulgov and the Associate Wardens, due in part to her continued attempts to notify BOP staff by email about the poor conditions at FCI Dublin." (*Id*.)

Later that month, on January 31, Fleming was placed in the SHU without cause— Fleming alleges she was not told that she had done anything to warrant placement in the SHU. (*Id*. at ¶ 58.) Fleming's SHU cell "was in even more disrepair than her non-segregation cell. The cell was freezing cold and filled with standing water, had mold on the walls, and emitted an overwhelming smell of sewage." (*Id*. at ¶ 59.) Fleming made multiple requests to the Assistance Health Services Administrator to be removed from the cell, however, she was denied medical care and forced to remain in the cell for seven days. (*Id*. at ¶ 60.) When Fleming was finally permitted to leave the SHU, she required a wheelchair because she was unable to walk. (*Id*. at ¶ 61.) She was also experiencing coughing spasms, full-body pain, headaches, and a viral infection. (*Id*.)

Fleming further alleges that prison officials later fabricated an incident report to retroactively justify her placement in SHU, that she was given job assignments in violation of restrictions that limited the departments to which she could be assigned, that her housing was changed due to false allegations that she was experiencing suicidal ideations, and that her application for transfer to home confinement under the CARES Act was denied without explanation despite her belief that she was qualified for such transfer. (*Id*. at ¶¶ 62–65.)

Fleming remained at FCI Dublin until April 19, 2024. (*Id*. at ¶ 23.) But her health problems and the issues with her medical treatment persisted. On November 24, 2024, Fleming was set to be transferred from BOP facilities in Oklahoma to BOP facilities in Florida, but the U.S. Marshal allegedly refused to accept her transfer because she was sent to the facility without her medication. (*Id*. at ¶ 69.) However, when she returned to the Oklahoma facilities, "none of her medication, including her three prescribed inhalers, were available to her." (*Id*.)

8

Fleming's health problems still affect her today.  (*Id*. at ¶ 70.)  She expects that her condition will continue to decline absent receiving the medical treatment that she asserts that she needs.  (*Id*.)

### D.    Procedural Background

On September 8, 2022, Fleming brought suit on her own behalf against the United States, Jusino, and several other Defendants comprising various federal agencies and their employees, as well as employees of FCI Dublin and FCI Tallahassee.  (Dkt. No. 1.)[2]  Fleming filed her first amended complaint on September 26, 2022, and a second amended complaint on November 15, 2023.  (Dkt. Nos. 11, 91.)  Fleming was referred by the Court to the Federal Pro Bono Project on August 29, 2024, and counsel was appointed on October 2, 2024.  (Dkt. Nos. 122, 124.)  Fleming, now with counsel, was granted leave to file the operative complaint on August 1, 2025, which added Lothrop as a Defendant.  (Dkt. No. 159.)  The operative complaint comprises four claims: (1) a negligence claim under the FTCA against the United States, (2) an intentional infliction of emotional distress claim under the FTCA against the United States, (3) a *Bivens* claim for cruel and unusual punishment under the Eighth Amendment against Jusino, and (4) a claim for injunctive relief under the Eighth Amendment against the United States and Lothrop.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege sufficient facts "to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint must allege "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.

---

[2] Fleming has filed a number of lawsuits in the past concerning her incarceration.  (*See, e.g.*, *Fleming v. Hamilton*, No. 22-cv-6121-JST (N.D. Cal. Oct. 14, 2022).)  Jusino's unopposed request for judicial notice (Dkt. No. 162 at 9 n.2) is granted.  *See Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

A court must also presume the truth of a plaintiff's allegations and draw all reasonable inferences in their favor. *See Boquist*, 32 F.4th at 773.  However, a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted).

## III.    DISCUSSION

Jusino (Dkt. No. 162) and the United States and Lothrop (Dkt. No. 163) move to dismiss all claims.  For the reasons that follow, the United States and Lothrop's motion is granted and Jusino's motion is denied.

### A.    The United States's Motion

***FTCA Claims***.  The operative complaint fails to state claims under the FTCA.  The United States "can only be sued to the extent it has waived its sovereign immunity."  *Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006).  Waivers of sovereign immunity are to be "strictly construed . . . in favor of the sovereign."  *Id*. (quoting *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999)).  The FTCA waives the United States's sovereign immunity "for certain torts committed by federal employees."  *Id*. (internal quotation marks omitted).  However, a precondition to bringing an FTCA claim is presenting an administrative claim to the proper federal agency.  Failure to properly present a claim prior to filing an FTCA suit is grounds for dismissal.  *See, e.g.*, *McNeil v. United States*, 508 U.S. 106, 112–13 (1993).  Under 28 U.S.C. § 2675(a),

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the *Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.*  The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

(emphasis added).  28 C.F.R. § 14.2(a) clarifies:

a claim shall be deemed to have been presented when a Federal agency *receives* from a claimant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident; and the title or legal capacity of the person signing, and is accompanied by evidence of his authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian, or other representative.

Accordingly, for an administrative claim to have been sufficiently "presented" as required by the FTCA, it is insufficient to simply mail the claim. *Vacek*, 447 F.3d at 1252 (collecting cases). Instead, the relevant federal agency must have received the claim. *Bailey v. United States*, 642 F.2d 344, 346–47 (9th Cir. 1981). Federal regulations provide that a claim shall be presented under the FTCA "as of the date it is received by the appropriate agency." 28 C.F.R. § 14.2(b)(1). The presentment requirement "is jurisdictional and must be interpreted strictly." *Vacek*, 447 F.3d at 1250. In accordance with this mandate, the Ninth Circuit has declined to read "exception[s] into the [FTCA] and the regulations because of the particular circumstances" of a case and continues to understand the presentment requirement as requiring actual receipt by the appropriate federal agency. *Bailey*, 642 F.3d at 647.

Fleming has not properly presented her administrative tort claim. Fleming alleges that she took "sufficient steps to exhaust her FTCA claim" on July 11, 2022, when she submitted a Form 95 to BOP claiming damages for injuries she incurred as a result of FCI Dublin's environmental conditions. (TAC ¶ 50.) Because BOP had neither accepted nor rejected the claim by January 11, 2023, Fleming asserted that she considered BOP's failure to decide to be a "final denial of her claim." (*Id*.) To be sure, under 28 U.S.C. § 2675(a), when an agency fails to make a final disposition of a claim within six months after it is filed, the claimant may deem the agency's inaction a final denial of her claim. However, BOP claims that it never received the July 11, 2022 claim, a conclusion it reached by searching through its Content Manager Database. (Dkt. No. 163-1 ("Vickers Decl.") at ¶¶ 20–23.) And Fleming's operative complaint contains no allegations that BOP ever received her administrative complaint prior to her filing suit in federal

11

court.[3]  Because BOP never received Fleming's administrative complaint, Fleming failed to satisfy the presentment requirement.

Fleming argues that equitable concerns would favor making an exception to the requirement that BOP needed to have received her administrative tort claim to satisfy the presentment requirement.  Certainly, Fleming's allegations that FCI Dublin staff prevented her and others at FCI Dublin from accessing administrative grievance forms and that she had to rely on those same prison staff to process her outgoing mail, including her Form 95, raise concerns regarding whether the prison staff interfered with her Form 95's delivery to BOP.  (Dkt. No. 167 at 13–14.)  However, Fleming's briefs have not identified any authority supporting an equitable exception to the presentment requirement in circumstances such as hers, nor was her counsel able to identify any such cases at oral argument.  The presentment requirement is a condition to the FTCA's waiver of sovereign immunity, and such waivers must be construed "strictly."  *See Vacek*, 447 F.3d at 1250.  Accordingly, the Court declines to read an equitable exception into the presentment requirement, at least based on the arguments presented by Fleming.

The motion to dismiss the FTCA claims is therefore granted.  Dismissal is without leave to amend, as any amendment would be futile.  However, dismissal is without prejudice to Fleming reasserting her claims after presenting them to the BOP as required.  As discussed at oral argument, although Fleming has now missed the deadline to present her claims to BOP, she may be entitled to equitable tolling of that deadline on the basis that she tried to present her Form 95 to BOP but prison officials at FCI Dublin interfered with its transmittal.  *See United States v. Wong*, 575 U.S. 402, 405 (2015).  Fleming has alleged facts that support a reasonable inference of interference with her mail.  Specifically, she alleges that she placed her completed Form 95 into the mailbox in her unit, where she had to rely on BOP staff to ensure that her mail was

---

[3] Fleming argues that she established that BOP received her administrative complaint by virtue of her attaching it as an exhibit to the operative complaint.  (Dkt. No. 167 at 12.)  This is insufficient to satisfy the FTCA's presentment requirement because BOP did not receive the claim prior to when she brought her claim in federal court.  *See Brady v. United States*, 211 F.3d 499, 503 (9th Cir. 2000).

properly delivered, and that prison staff had previously interfered with her mail and had a pattern of retaliating against her.  (TAC ¶¶ 50, 56; *see also* Dkt. No. 170 at ¶ 6.)  These issues should be considered by BOP in the first instance.  The logic of the FTCA's presentment requirement is to permit the government to address any allegations prior to going to court.  *See Brady*, 211 F.3d at 503.  If BOP declines to apply equitable tolling and refuses to consider Fleming's claims, she may reassert her claims in this case and their viability in light of equitable tolling principles may be assessed at that time.  That issue, however, is not yet properly before the Court.

*Injunctive Relief Claim*.  The operative complaint also fails to state an injunctive relief claim under the Eighth Amendment against the United States and Lothrop.  A prisoner's claims concerning a particular prison are mooted by transfer to a different prison unless the prisoner demonstrates a reasonable expectation that they will subjected again to the misconduct they challenge—for instance, because they are likely to be transferred back to the old prison or the misconduct is likely to persist in the new one.  *See Walker v. Beard*, 789 F.3d 1125, 1132 (9th Cir. 2015).

The operative complaint does not contain any allegations that Fleming is likely to be transferred back to FCI Dublin, which is now closed.  Nor has Fleming alleged that other prisons are likely to have the same environmental hazards as FCI Dublin, for example, asbestos, mold, and bird feces.  The operative complaint also contains no allegations that Fleming has experienced any retaliatory conduct in the prisons in which she has been incarcerated following her transfer from FCI Dublin, and no allegations that these prisons have violated the CARES Act, lacked an inadequate administrative grievance process, or failed to provide her access to attorney calls and visits.  (TAC ¶ 24.)  Accordingly, Fleming's claim for injunctive relief is moot to the extent that it requests these remedies, and other remedies tied to misconduct alleged to have occurred at only FCI Dublin.  *See Walker*, 789 F.3d at 1132.

Fleming alleges that even after being transferred out of FCI Dublin, she is still receiving inadequate care for the medical conditions she developed while incarcerated there.  (*See, e.g.*, TAC ¶ 67.)  Accordingly, Fleming's claim for injunctive relief arising from her continued

inadequate healthcare is not moot.  (*See* Dkt. No. 159 at 3.)  However, Fleming has not exhausted administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA").  Under the PLRA, "No action shall be brought with respect to prison conditions under . . . Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  A prisoner need only exhaust "available remedies."  *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014).  "To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'"  *Id*. (quoting *Brown v. Croak*, 312 F.3d 109, 113 (3d Cir. 2002)).  Failure to exhaust a claim under the PLRA requires dismissal.  *See McKinney v. Carey*, 311 F.3d 1198, 1200 (9th Cir. 2002).

After being transferred from FCI Dublin, Fleming has filed 44 administrative grievances. (Vickers Decl. ¶¶ 11–12.)  But none of the grievances Fleming has filed since leaving FCI Dublin have concerned the inadequacy of her healthcare.  (*Id*. at ¶ 13.)  Fleming argues generally that administrative remedies were unavailable.  (Dkt. No. 167 at 9–10.)  However, the operative complaint alleges only that staff at *FCI Dublin* interfered with Fleming's ability to access administrative grievance forms, and Fleming does not allege that she had difficulty accessing administrative grievances at any of the prisons in which she was later housed.  (Dkt. No. 179 at 8–9.)  The United States and Lothrop have demonstrated that Fleming failed to exhaust available administrative remedies with regard to her complaints about her continued insufficient medical care.  The motion to dismiss the injunctive relief claim is thus granted.  Dismissal is with leave to amend, as the Court cannot conclude on the current record that amendment would be futile.

### B.    Jusino's Motion

The operative complaint states a *Bivens* claim for deliberate indifference to serious medical needs under the Eighth Amendment.[4]  Jusino argues (a) the operative complaint fails to

---

[4] Fleming's motion to file a supplemental declaration that doctors have recommended her separation from the environmental toxins at issue is denied as moot, because that information is not necessary to this Order's determination allowing her claim against Jusino to proceed.  (Dkt. No. 187.)

state an Eighth Amendment violation, (b) Fleming has no cause of action under *Bivens*, and (c) Jusino is entitled to qualified immunity.  (Dkt. No. 162 at 8, 11, 18.)  These arguments fail.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A determination of "deliberate indifference" involves an examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  As to the first element, a plaintiff "must show a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'"  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin*, 974 F.2d at 1059).  As to the second element, a plaintiff must demonstrate that the "defendant's response to the need was deliberately indifferent," which "is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  *Id*.

Fleming's complaint states sufficient facts giving plausible rise to an Eighth Amendment violation.  The complaint contains allegations that Fleming experienced significant negative health effects as a result of her incarceration in FCI Dublin, where she was exposed on a daily basis to the prison's "toxic environmental conditions."  (TAC ¶ 18.)  Her symptoms were serious, including chronic sinusitis, headaches, coughing spasms, memory problems, and muscle pain, and she was ultimately diagnosed with asthma and treated with medication for chronic obstructive pulmonary disease.  (*Id*. at ¶¶ 31–32.)  She also alleges that her continued exposure to environmental toxins at FCI Dublin made her health problems worse, and that she still has significant health problems.  (*Id*. at ¶¶ 24, 31, 33.)  Taken together, these allegations concerning Fleming's untreated, declining medical condition are sufficient to establish that Fleming's medical needs were serious.  *See Jett*, 439 F.3d at 1096.

The complaint also contains sufficient facts to support a plausible inference that Jusino was deliberately indifferent to Fleming's medical needs.  As described above, over the course of several emails, Fleming informed Jusino about her diagnosis with lung disease and her serious respiratory issues such as choking and coughing fits.  (*E.g.*, Ex. 1.)  Fleming also told Jusino that BOP doctors had acknowledged that she had a serious respiratory illness and that she was sensitive to the environmental conditions at FCI Dublin such that her respiratory system remained in distress as long as she remained exposed to those contaminants.  (*E.g.*, Exs. 1, 2, 3.)  Fleming repeatedly conveyed that she "need[ed] treatment aimed at preventing further exposure to mold/asbestos/excessive bird droppings," the environmental toxins that were causing her health problems.  (Ex. 2.)  And Fleming accused Jusino of "know[ing] [that the] prison has mold/asbestos/bird contamination, which aggravate[d] [Fleming's] disease."  (Ex. 5.)  Given the ongoing investigations at the time concerning the toxic environmental conditions at FCI Dublin, Fleming has also plausibly alleged that Jusino was aware of the impact of those environmental conditions on respiratory health generally.  However, Fleming alleges that Jusino failed to remove these toxic environmental conditions from her quarters.  (*E.g.*, TAC ¶ 55.)  Fleming alleges that prison staff instead made the conditions worse, for example, by "buffing the floors" and releasing more friable asbestos into the air.  (Ex. 5.)[5]

The facts in the operative complaint support a plausible inference that Jusino knew multiple doctors had confirmed that Fleming was experiencing serious respiratory distress due to the mold, asbestos, and bird feces at FCI Dublin, and that her health was getting worse because she remained in those conditions.  Moreover, the facts in the operative complaint support a plausible inference that Jusino knew that Fleming had to be separated from those environmental toxins for her health problems to resolve, and that Jusino acted with deliberate indifference by refusing to do so.  *See Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014).

---

[5] The complaint, however, does not contain any allegations suggesting that Jusino knew that Fleming did not have access to a comprehensive health exam or her prescription medicines.  (*See* Exs. 1, 2, 3, 5.)  Accordingly, Fleming's complaint fails to state an Eighth Amendment violation arising from these allegations.  (*See* TAC ¶¶ 38, 68.)

Fleming also satisfies the requirements to pursue her Eighth Amendment claim under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  In *Bivens*, the Supreme Court "held that it had authority to create 'a cause of action under the Fourth Amendment' against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations."  *Egbert v. Boule*, 596 U.S. 482, 490 (2022) (quoting *Bivens*, 403 U.S. at 397).  Since *Bivens*, the Supreme Court has recognized an "implied cause of action" for damages under the Constitution in two other cases: first, in *Davis v. Passman*, 442 U.S. 228 (1979), for a former congressional staffer's sex discrimination claim under the Fifth Amendment; and second, in *Carlson v. Green*, 446 U.S. 14 (1980), for a federal prisoner's inadequate medical care claim under the Eighth Amendment.  *See Egbert*, 596 U.S. at 490–91.  But the Supreme Court has not since "implied additional causes of action under the Constitution."  *Id*. at 491.  Indeed, "expanding the *Bivens* remedy is now considered a disfavored judicial activity."  *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (internal quotation marks omitted).

Accordingly, determining whether to recognize a *Bivens* cause of action in a particular case involves a two-step process.  First, a court must ask whether a case presents a "new *Bivens* context," namely, whether a case is "meaningfully different" from the prior cases in which the Supreme Court has recognized a cause of action for damages.  *Egbert*, 596 U.S. at 492 (internal quotation marks omitted).  Second, if the case presents a new context, the court must determine whether there are any "'special factors' indicat[ing] that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'"  *Id.* (quoting *Ziglar*, 582 U.S. at 136).

Fleming's case does not present a new *Bivens* context.  Fleming's case falls squarely within *Carlson*, where the Supreme Court implied a damages remedy under the Eighth Amendment against federal prison officials for deliberate indifference to medical needs.  *See Carlson*, 446 U.S. at 16 n.1, 18–19.  Fleming alleges that she was experiencing significant respiratory distress and other serious symptoms during her incarceration at FCI Dublin.  She asserts that this serious medical need had to be addressed by separating her from the

17

environmental toxins that prevented her from being able to breathe, but Jusino was deliberately indifferent to that need.  The Ninth Circuit has squarely held that *Bivens* claims may be brought alleging that prison officials acted with deliberate indifference when they failed to undertake necessary affirmative acts to address serious medical needs, because those claims fall within the established *Carlson* framework.  *Watanabe v. Derr*, 115 F.4th 1034, 1041 (9th Cir. 2024) ("[E]ven if Watanabe had only alleged an omission—*e.g.*, that his requests for treatment were repeatedly denied—his claim would still be one of deliberate medical indifference, a viable *Bivens* cause of action.").

Jusino contends that because the action required by Fleming's medical needs affected the conditions of her confinement, Fleming's claim must be treated as a new *Bivens* context.  It is well established that challenges to conditions of confinement can present a new *Bivens* context when those challenges are not otherwise grounded in an established *Bivens* context.  *See Ziglar*, 582 U.S. at 140.  But where a claim falls within an established context, such as indifference to serious medical needs, it does not become a new type of claim merely because the required action involves the prisoner's housing, food, or other conditions of confinement.  There is no meaningful distinction between a doctor's order requiring a prisoner to have crutches for a broken leg and a doctor's order requiring the prisoner not to have to sleep on an upper bunk.  Likewise, in Fleming's case, there is no meaningful distinction between deliberate indifference to serious respiratory needs that require separation from asbestos, toxic mold, and feces, versus serious medical needs that require surgery or a prescription inhaler.

Jusino identifies no case law that supports her unduly restrictive understanding of what constitutes a new *Bivens* context.  In determining whether a case presents a new *Bivens* context, the Supreme Court has provided a non-exhaustive list of factors including "the rank of the officers involved; the constitutional right at issue; [and] the generality or specificity of the official action."  *Id*. at 140.  None of those factors would appear to turn on whether the need at issue involved a medical procedure versus a change in the prisoner's housing, food, or other conditions of confinement.  In other contexts, the Ninth Circuit has rejected the principle that

18

deliberate indifference claims can be distinguished from *Carlson* "based on the severity of the injury or misconduct," because drawing such distinctions would be "arbitrary." *Watanabe v. Derr*, 139 F.4th 1056, 1060 (9th Cir. 2025). The same logic applies to the distinction that Jusino proposes.

Jusino also argues that because she was the former Warden of FCI Dublin, the claims against her arise in a supervisory capacity and thus create a new *Bivens* context. (*See* Dkt. No. 162 at 16.) However, the Ninth Circuit has concluded that deliberate indifference claims against wardens of a prison do not provide a new *Bivens* context. *See, e.g.*, *Stanard v. Dy*, 88 F.4th 811, 818 (9th Cir. 2023); *Kaneakua v. Derr*, No. 23-1587, 2025 WL 1924889, at *1 (9th Cir. July 14, 2025).

Jusino's arguments that "special factors" counsel against extending *Bivens* presuppose that Fleming's allegations present a new *Bivens* context. Because Fleming's case falls within the *Carlson* context, Fleming can assert a *Bivens* claim for her deliberate indifference claim under the Eighth Amendment, and the Court need not consider arguments about potential "special factors." (*See* Dkt. No. 162 at 16–18.)

Jusino's argument for qualified immunity is derivative of her *Bivens* argument. (Dkt. No. 162 at 18–19.) "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). At the time of Fleming's incarceration at FCI Dublin, it was clearly established that deliberate indifference to serious medical needs is an Eighth Amendment violation. *See Carlson*, 446 at U.S. at 19. And given Fleming's allegations that Jusino knew about her respiratory issues and that separating her from FCI Dublin's environmental contaminants would be necessary to address her respiratory issues, Fleming has stated a plausible claim that Jusino acted with deliberate indifference to her medical needs. Jusino is therefore not entitled to qualified immunity, and her motion to dismiss is denied.

IV.    **CONCLUSION**

For the foregoing reasons, the United States and Lothrop's motion to dismiss is granted and Jusino's motion to dismiss is denied.  Dismissal is with leave to amend except as provided above.  Fleming shall file any amended complaint by **April 10, 2026**.  Fleming may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.  If no such amended complaint is filed by that date, the claims that were dismissed in this Order will remain dismissed.

**IT IS SO ORDERED.**

Dated: March 20, 2026

RITA F. LIN
United States District Judge

20